IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAMES C. HECKARD,

               Petitioner,              No. CIV S-03-0023 DFL EFB P

     vs.

TOM L. CAREY,

               Respondent.         FINDINGS & RECOMMENDATIONS

_____/

      Petitioner is a state prisoner serving a sentence of sixty-three years to life imprisonment pursuant to a 2000 judgment of conviction entered against him in the Sacramento County Superior Court. He was convicted of first-degree robbery of an inhabited dwelling in concert with two or more people, assault with a semi-automatic firearm, and receiving stolen property. He filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition challenges the conviction on the grounds that counsel rendered ineffective assistance by: (1) failing to engage in adequate pretrial investigation; (2) failing to consult with him; (3) failing to adequately inform him of two proffered plea bargain offers; (4) rendering incompetent representation; (5) failing to adequately interview his co-defendant before examining him on the witness stand; and (6) advising petitioner to waive jury trial on his prior strike convictions.

////

1

Petitioner's second and third claims turn on the allegation that his former attorneys failed to inform and advise him as to two plea bargain offers. An evidentiary hearing was held on January 23, 2007, to resolve the conflicting testimony between petitioner and his former attorneys as to this allegation. Petitioner, his former attorneys, Peter Vlautin and Sandra Martin, and the prosecutor, Alice Wong, all appeared and testified at the hearing. Additionally, an offer of proof was accepted as to Marquis Lewis, petitioner's nephew, to the effect that petitioner had previously complained about his attorneys.

Upon careful consideration of the entire record, including the testimony and evidence submitted at the evidentiary hearing and the parties' arguments and briefs, and for the reasons set forth below, the undersigned recommends that petitioner's application for habeas corpus relief be denied.

## I.    Factual Background[1]

On January 30, 1997, 14-year-old Joseph Schroeder ("Joseph") was living at 2748 Hurley Way in Sacramento. (RT 30-31.)[2]  Joseph lived with his mother, who instructed him to not allow anyone in the house when she was not home. (RT 31.)  At 4:45 p.m., Joseph's mother was not at home and he was talking on the telephone. (RT 31.)  Joseph heard a knock on the door, and when he opened it, his friend Al was at the door with his friend Wil. (RT 33-34.)

Al and Wil asked to come inside, but Joseph told the[m] he could not let anyone in his house. Al and Wil ignored him and pushed their way in. (RT 35.)  Less than a minute later there was another knock at the door. (RT 36-37.)  Joseph looked out of the peephole and did not recognize the two persons standing outside. Wil attempted to unlock the door, stating "it's my uncle, you can let him in" while Joseph tried to keep the door locked. (RT 39.)  Joseph did not want to open the door because he knew that he was about to be robbed because Al had

---

[1]  This statement of factual background is taken from respondent's answer, at pp. 4-5, filed July 16, 2003.  The facts as found by the undersigned based on the testimony of the witnesses at the evidentiary hearing are separately stated below in the discussion of claims 2 and 3.

[2]  These Findings and Recommendation refer to two different Reporter's Transcripts. The first is the trial transcript from the criminal trial, which is referred to herein as "RT."  The second is the transcript of the Evidentiary Hearing held in this court on January 23, 2007, which is referred to herein as "EH RT."

1   told him that "Goldie"[3] and Wil were robbing people.  (RT 39-40.)

2   Wil finally opened the door and petitioner and another man entered Joseph's
    house.  (RT 41.)  Petitioner said "give me your cash" while the other man pulled
3   out what looked like a semi-automatic .9 millimeter handgun and pointed it at
    Joseph.  (RT 42-43.)  Joseph handed [p]etitioner the $99 that he had in his pocket
4   and also gave [p]etitioner his pager.  (RT 43-44.)  Then, [p]etitioner, Wil and Al
    went to Joseph's mother's bedroom while the gunman kept his gun pointed at
5   Joseph.  (RT 45.)  When they came back to where Joseph was, Wil had Joseph's
    mother's handgun with him.  (RT 47.)  Al told Joseph not to call the police or he
6   would blow up his house.  The foursome then left the house.  (RT 50.)

7   Joseph locked the door and picked up the cordless phone but it did not work.  He
    later noticed that the cord had been ripped out of the wall.  (RT 50-51.)  Joseph
8   went to his mother's bedroom, which had been ransacked, and called his mother.
    (RT 51.)  His mother left work and called the police.  (RT 51-52, 102.)

9
    Petitioner was arrested on February 6, 1997, hiding in the closet of his apartment.
10  After a search of [p]etitioner's apartment, the police found three cellular
    telephones.  (RT 432-434.)  One of the phones had been stolen from [a] vehicle
11  on December 29, 1996.  (RT 436-437.)  The serial number stickers from the other
    two cellular phones had been removed.  (RT 438-440.)

12

13  **II.   Analysis**

14     **A.  Standards for a Writ of Habeas Corpus**

15         Federal habeas corpus relief is not available for any claim decided on the merits in state

16  court proceedings unless the state court's adjudication of the claim:

17             (1) resulted in a decision that was contrary to, or involved an unreasonable
               application of, clearly established Federal law, as determined by the Supreme
18             Court of the United States; or

19             (2) resulted in a decision that was based on an unreasonable determination of the
               facts in light of the evidence presented in the State court proceeding.
20

21  28 U.S.C. § 2254(d).

22         Under section 2254(d)(1), a state court decision is "contrary to" clearly established

23  United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law

24  set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially

25  _____

26         [3]  It was stipulated that petitioner was known as "Goldie."  RT 474.

                                          3

1    indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at a different

2    result.  *Early v. Packer*, 573 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-406

3    (2000)).

4           Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas

5    court may grant the writ if the state court identifies the correct governing legal principle from the

6    Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

7    case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ simply because

8    that court concludes in its independent judgment that the relevant state-court decision applied

9    clearly established federal law erroneously or incorrectly.  Rather, that application must also be

10   unreasonable."  *Id.* at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (it is "not

11   enough that a federal habeas court, in its independent review of the legal question, is left with a

12   'firm conviction' that the state court was 'erroneous.'")

13          The court looks to the last reasoned state court decision as the basis for the state court

14   judgment.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a

15   decision on the merits but provides no reasoning to support its conclusion, a federal

16   habeas court independently reviews the record to determine whether habeas corpus relief is

17   available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  Where it

18   is clear that a state court has not reached the merits of a petitioner's claim, or has denied the

19   claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal

20   habeas court must review the claim de novo.  *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir.

21   2003); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002).

22          **B.  Applicable Law**

23          The Sixth Amendment protects the right to effective assistance of counsel.  The United

24   States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

25   *Strickland v. Washington*, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

26   counsel, a petitioner must first show that, considering all the circumstances, counsel's

4

1  performance fell below an objective standard of reasonableness.  *Id.* at 687-88.  After a petitioner

2  identifies the acts or omissions that are alleged not to have been the result of reasonable

3  professional judgment, the court must determine whether, in light of all the circumstances, the

4  identified acts or omissions were outside the wide range of professional, competent assistance.

5  *Id.* at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  In assessing an ineffective assistance of

6  counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

7  range of professional assistance.'"  *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (quoting

8  *Strickland*, 466 U.S. at 689).  There is, in addition, a strong presumption that counsel "exercised

9  acceptable professional judgment in all significant decisions made."  *Hughes v. Borg*, 898 F.2d

10  695, 702 (9th Cir. 1990) (citing *Strickland*, 466 U.S. at 689).

11          Second, a petitioner must establish that he was prejudiced by counsel's deficient

12  performance.  *Strickland*, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable

13  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

14  been different."  *Id.* at 694.  A reasonable probability is "a probability sufficient to undermine

15  confidence in the outcome."  *Id.  See also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224

16  F.3d 972, 981 (9th Cir. 2000).

17          It is unnecessary for a federal court considering a habeas ineffective assistance of counsel

18  claim to address the prejudice prong of the *Strickland* test if the petitioner cannot even establish

19  incompetence under the first prong.  *See Siripongs v. Calderon,* 133 F.3d 732, 737 (9th

20  Cir.1998).  Further, a reviewing court "need not determine whether counsel's performance was

21  deficient before examining the prejudice suffered by the defendant as a result of the alleged

22  deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

23  sufficient prejudice . . . that course should be followed."  *Pizzuto v. Arave*, 280 F.3d 949, 955

24  (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 697).

25  ////

26  ////

1    **C.  Petitioner's Claims**

2       Petitioner was represented at different times by two attorneys before trial, and a third at

3    trial.  Petitioner claims that he received ineffective assistance of counsel from each of these

4    attorneys in violation of the Sixth Amendment on six bases.  The California state courts did not

5    address these claims on the merits.  This court therefore conducts a de novo review of

6    petitioner's claims.  *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003); *Pirtle v. Morgan*, 313

7    F.3d 1160, 1167 (9th Cir. 2002).

8                    **1.  Alleged Failure to Engage in Adequate Pretrial Investigation**

9       Petitioner's first claim is that counsel rendered ineffective assistance by failing to

10   "engage in adequate pretrial investigation."  Attachment to Petition (hereafter "Pet.") at 3(12).[4]

11   Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision

12   that makes particular investigations unnecessary."  *Strickland*, 466 U.S. at 691.  However,

13   "'ineffective assistance claims based on a duty to investigate must be considered in light of the

14   strength of the government's case.'"  *Bragg v. Galaza*, 242 F.3d 1082, 1088 (9th Cir. 2001)

15   (quoting *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986)).  *See also Hayes v.*

16   *Woodford*, 301 F.3d 1054, 1070 (9th Cir. 2002).  Here, the state's case against petitioner was

17   overwhelming.  The robbery victim identified petitioner as one of the robbers.  Moreover, as to

18   the receipt of stolen property count, petitioner was arrested with the stolen property.  RT 41-43,

19   423-427.

20      Petitioner fails to identify what investigation should have been undertaken, what

21   information could have been obtained with such investigation, and whether, assuming the

22   evidence would have been admissible, it would have produced a different result.  *Hamilton v.*

23   *Vasquez*, 17 F.3d 1149, 1157 (9th Cir. 1994); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994)

24   ──────────────

25          [4] For reasons not apparent to the court, petitioner uses a pagination system for his
     attachment to the petition that includes the number 3 as a prefix, followed by the actual page
26   number in parens.

1   ("Conclusory allegations [of ineffective assistance of counsel] which are not supported by a

2   statement of specific facts do not warrant habeas relief.").  Petitioner has failed to demonstrate

3   that his counsel's performance was deficient.  Accordingly, petitioner is not entitled to relief on

4   this claim.

5                              **2.  Alleged Failure to Consult with Petitioner**

6          Petitioner's second claim is that counsel rendered ineffective assistance by failing to

7   consult with him.  Specifically, petitioner claims that he "conferred with no attorney prior to his

8   preliminary hearing."  Pet. at 3(21).  Petitioner argues that he was arraigned on February 11,

9   1997, and did not meet with an attorney until February 25, 1997, when a preliminary hearing was

10  scheduled.  Pet. at 3(16).  He reiterated this claim in his testimony at the evidentiary hearing.

11         The record contains evidence that petitioner first met with an attorney on February 24,

12  1997, and the preliminary hearing was ultimately held on May 5, 1997.  Pet., Exs. 7, 8.[5]

13  Between those dates, the record shows that petitioner met and discussed plea offers with counsel

14  no fewer than five times out of the ten recorded court appearances and jail visits in evidence.

15  Pet., Exs. 7-9.[6]  The court transcript of the preliminary hearing also shows that the trial judge

16  explained the charges and then asked petitioner, "Have you discussed this matter, and are you

17  familiar with what you're charged with, then, Mr. Heckard?  You've discussed it with your

18  attorney?"  Clerk's Transcript on Appeal (hereafter "CT") at 28.  Petitioner replied, "Yes, I am

19  sir."  CT 28.

20         Petitioner's claim is contradicted by the record, and petitioner offers no independently

21  corroborated evidence that counsel failed to consult with him.  Petitioner cannot establish

22  _____

23         [5] Petitioner submitted exhibits at the evidentiary hearing.  They are referred to herein as
    "Pet. Ex." followed by the exhibit number.  Although respondent also submitted exhibits at the
24  hearing, they were essentially identical to those submitted by petitioner.  Accordingly, the court
    will use the exhibit numbers to the petitioner's exhibits.

25         [6] Although petitioner disputes his former attorneys' testimony and records documenting
26  those meetings and discussions, for the reasons stated below under section 3, the court credits the
    testimony of his former counsel and rejects the testimony of petitioner as not credible.

1   incompetence on these facts and is therefore not entitled to relief on this claim.  Moreover, as

2   discussed below as to the third claim, the testimony clearly shows and the court finds that

3   petitioner's counsel did advise him as to the plea bargains that were offered and the consequence

4   of not accepting them.

5   ### 3.  Alleged Failure to Inform Petitioner of Two Proffered Plea Bargain Offers

6

7   Petitioner claims that he was inadequately informed of two plea-bargain offers made

8   prior to the preliminary hearing; an offer of six years and a subsequent offer of fifteen years and

9   three months.  Petitioner admits that on February 25, 1997, he was informed of the offer of six

10  years and he refused to accept it.  However, he claims that he was not advised to accept the offer.

11  He also claims that he was not informed of the risk of a third, uncharged strike being added to

12  the complaint and substantially increasing his exposure to a much higher prison sentence.  He

13  also claims that he was not informed of the subsequent offer of fifteen years and three months.

14  He claims that he would have accepted either offer if he had received appropriate legal advice.

15  The attorneys who represented petitioner at the time testified that petitioner was informed of the

16  offers and the consequences of rejecting them.  Notwithstanding the recommendation of counsel,

17  petitioner refused to accept either offer and insisted on going to trial.

18  ### I.  The Six-Year Offer

19  Petitioner testified that no one from the Public Defender's office met with him until the

20  date set for his preliminary hearing, February 25, 1997.[7]  On that day, attorney Peter Vlautin of

21  Public Defender's office showed up and explained to petitioner that the assigned attorney was ill

22  and that Mr. Vlautin would be filling in as petitioner's attorney for the proceedings that day.

23  According to petitioner, Mr. Vlautin said he had not yet spoken with the assigned deputy district

24  attorney but was about to do so.  Petitioner testified that Mr. Vlautin returned approximately 30

25

26      [7] Specifically, petitioner disputes the record by the Public Defender's office stating that
attorney Alison Merrilees of that office met with him at the jail on February 24.

1  minutes later and told petitioner that the prosecution had offered a six-year plea bargain.

2  Petitioner further admits that he refused to accept that offer.  EH RT 26-27.

3       Petitioner and Mr. Vlautin agree on most of the particulars to this point.  However,

4  petitioner testified that Mr. Vlautin never explained to him that by rejecting the six-year deal he

5  exposed himself to being charged with a third strike and facing up to a life sentence.  Petitioner

6  also claimed that he was never advised to accept the offer and was erroneously told that the offer

7  would remain open for petitioner to consider.  He claims that had his attorney explained to him

8  that his prior first-degree burglary was a strike he would have accepted the six-year deal.

9  However, petitioner's testimony flies in the face of the records maintained by the Public

10 Defender's office detailing the content of the communications by the attorneys from that office

11 with the defendant.

12      Handwritten notations on a form labeled "Chronological Record of Contacts," Pet.'s Ex.

13 7, show that an attorney from the Sacramento County Public Defender's Office named A.

14 Merrilees met with the defendant on February 24, the day before the court appearance in

15 question.  Referred to as a "chrono sheet," this record is part of the Public Defender's office file

16 for petitioner's case.  EH RT at 40.  The notation for that day indicates that the defendant had an

17 uncharged strike that the district attorney's office had not yet discovered, "making this his 3rd

18 strike!"  Pet., Ex. 7.  The notation further indicates that the uncharged strike was "not on rap

19 sheet."  *Id.* (emphasis in original).  Each word in this phrase is double underlined.  The entry on

20 that date is a clear red flag that the prosecutor had not yet discovered the third strike, but that

21 once discovered, petitioner would be facing exposure to a much higher prison term.

22      Petitioner testified that this meeting did not occur on the 24th, but instead happened on

23 March 3, 1997.  EH RT at 9.  Significantly, he concedes that there was such a meeting, he simply

24 disputes its timing.  The court cannot credit petitioner's testimony as to the timing of the

25 meeting.  The record of contacts is in chronological order with the earliest on top, and

26 subsequent notes of contacts entered below.  The first entry is by A. Merrilees and it plainly

9

1    states that she communicated with petitioner on the date in question.  More importantly, she

2    notes the critical information that petitioner had a prior first degree burglary conviction that the

3    district attorney had not yet discovered.  The very next entry on the log is dated February 25, is

4    in markedly different writing, and shows that the attorney who appeared on the 25th specifically

5    acted upon the vital information identified by A. Merrilees in her February 24 notation.  What is

6    significant is that petitioner does recall a meeting in which that information was developed.  In

7    explaining that he recalls the meeting happening on a different date, petitioner admitted that the

8    information written on the chrono sheet by Merrilees actually reflects a conversation he had with

9    her.  EH RT at 96 ("the attorney entry there sounds like a conversation that I had with [the]

10   attorney 3/3/97.").  It is the entry by Merrilees that first identifies the critical fact that the

11   petitioner "has uncharged  2nd strike! (making this his 3rd strike!)."  In admitting that he recalls

12   such a conversation, he necessarily concedes that he was aware of the uncharged third strike.

13   Moreover, petitioner's claim that the meeting happened in March is not credible.[8]  This entry is

14   not only dated "2/24" it immediately precedes the entry for "2/25" which shows that the defense

15   counsel who met with petitioner on the 25th tried to act on that critical information to save

16   petitioner from the consequence of the complaint being amended to add the third strike.

17        The Chronological Record of Contacts shows that on February 25, 1997, Peter Vlautin

18   appeared on behalf of petitioner and was very mindful of the notation on the 24th by Merrillees.

19   Mr. Vlautin was a supervisor in the Public Defender's office at the time.  He examined the

20   Chronological Record of Contacts, Pet.'s Ex. 7, and testified that the document was part of the

21   Public Defender's office file for petitioner's case.  He explained that the "chrono sheet" was a

22   part of a practice within the office for attorneys to write "notes of their conversations with

23   inmates so that another lawyer could at least pick up the file and pick up where someone else left

24

25        [8] Petitioner relies on the absence of an entry in the jail visitor log to account for the
     attorney visit on February 24, 1997.  However, the records of the Public Defender's office are
26   clear and specific that the meeting, in fact, occurred on February 24, 1997.

1  off." EH RT 40.  He confirmed that he wrote the handwritten notations for the date of February

2  25, adding "[a]nd I recognize my handwriting on the entry of 2/25."  *Id.*  Under cross-

3  examination, Mr. Vlautin confirmed that under this practice he would have been apprised of the

4  uncharged strike and its significance.  He explained that:

5          I'm sure I would have made myself aware of the facts of the case.
           And also I see that the entry prior to mine, the day before was
6          February 24th, by A. Merrilee, which would be Alison Merrilee,
           who was a lawyer at that time in our office, and she noted that the
7          defendant has an uncharged second strike, making this a three
           strike case, and that it was a first degree burglary out of Santa
8          Clara County, 1992, that apparently is not on his rap sheet. So I
           would have been made aware of the fact that there was an
9          uncharged third strike possibly hanging out there somewhere.

10  EH RT at 48.

11          With that knowledge, Mr. Vlautin handled the court appearance and communicated to the

12  defendant on February 25 the offer to plea bargain for six years.  Mr. Vlautin testified from his

13  notes, which were entered at the time of the event on that date.  He credibly described in detail

14  the pattern and practices of the office and of his practices in particular and related those practices

15  to the information recorded on the Chronological Record of Contacts.  He explained that the

16  purpose of the notes he entered on that day was to document his communications with the

17  defendant so that another attorney would know what had occurred.  Although petitioner testified

18  that Mr. Vlautin never advised petitioner to accept the six-year offer, and never advised

19  petitioner that he was facing a much higher sentence with the additional prior conviction, Mr.

20  Vlautin's notation specifically says that the petitioner was "offered LT 211 1[degree] 3ys x 2 =

21  6ys."  Vlautin explained the entry as follows:

22          I wrote, defendant offered low term, 211, meaning Penal Code
           Section 211, first degree robbery, and the offer was three years
23          times two for a total of six years.  *I wrote that he is facing 35 years
           to life when and if the D.A. alleges other strike.*  Then there is a
24          reference to his rap sheet.  *Defendant says that he is not guilty.*  He
           may hire a private lawyer.  And then those are my initials, Peter V.
25

26  EH RT 40 (emphasis added).  Mr. Vlautin also testified that it was his habit and practice to

1  convey an offer to the defendants and:

2          . . . this would have been in the tank outside of the particular
           courtroom that we were in. And according to my notes I told him
3          that the offer was a low term on robbery first degree, that it would
           be three years, they had one strike alleged, which means it would
4          be doubled for six years.
                   And I told him that he was facing 35 to life because apparently
5          I had access to the rap sheet, and it showed what I believe to be
           another strike that the prosecutor had not picked up on yet, and so I
6          told him that.
                   And when I wrote defendant says he's not guilty, that generally
7          would be my way of explaining to myself and the file that he's not
           pleading guilty because he says he's not guilty, so therefore he's
8          not going to plead guilty.

9  EH RT 41-42.  Mr. Vlautin testified that it was his normal practice to inform defendants of plea

10 offers, and a specific requirement to do so.

11         The court finds Mr. Vlautin's testimony credible and consistent with the documentary

12 evidence.  Relying on notes that he wrote at the time of the event, he was clear and persuasive

13 that he plainly did communicate to the petitioner the offer and explain the urgency of accepting

14 it.  In contrast, the petitioner's testimony that he was informed of the six-year offer but never

15 told of the uncharged strike looming over him was not credible.  Indeed, the claim that an

16 experienced public defender would communicate a six-year offer after just reading the notes

17 entered the day before about an uncharged third strike exposing petitioner to a life sentence and

18 not once advise of the consequences of not accepting the offer, strains credulity.  The petitioner

19 admitted in his testimony that he was told of the six-year offer.  He admitted that he refused to

20 accept it.  His claim that Mr. Vlautin failed to explain to him that the prosecution was unaware of

21 the uncharged strike and the importance of immediately accepting the offer is simply not

22 believable.

23         Petitioner's attempt to explain away his refusal to accept the offer further undermines his

24 credibility.  He claims that he was told of an offer that consisted of "three years for the 211 and

25 three years for the gun use, which is going to be six years."  EH RT at 12-13.  He then testified

26 that he had hesitations because of confusion over whether the enhancement was accurate.  To

1  explain his reluctance, he said "I knew that the 12022 (a)(1) was a one-year enhancement not a

2  three-year . . .  and I knew that, and that's why I was considering whether or not to take the

3  deal." EH RT at 14.  None of the entries in the chrono log reference an offer based on that

4  analysis and petitioner's testimony to that effect was not credible.

5       Petitioner also testified that attorney Vlautin told petitioner he had a week or two to think

6  about the offer and that it would still be open at the next court date.  Again, this assertion defies

7  commonsense.  It is contrary to two urgent notations in the chrono record about the

8  consequences of the third strike once the district attorney's office discovers it.  Mr. Vlautin,

9  assisted by his written notations entered on the same date of the conversation, testified that he

10  advised petitioner that the prior burglary was a strike and that petitioner would be exposed to

11  three strikes if the case was not immediately resolved.  The testimony was compelling.  Indeed,

12  his notes expressly say that petitioner was facing "35 to life" but that petitioner says he is not

13  guilty.

14       Petitioner admitted that he told Mr. Vlautin that he was not guilty and that he would not

15  plead guilty that day.  EH RT 26-27.  Petitioner attempted to explain away the significance of

16  that fact, testifying that:

17           Yes, I did. That was actually before I even read the -- I was still
            laboring under the impression that I was being charged for the
18           robbery because of a statement that one of the juveniles had made.
            I actually didn't know that I was being charged for the robbery
19           because somebody put me there at the scene and actually said that
            I was the guy that did the robbery personally.
20

21  EH RT 27.  The explanation suggests a great deal about how seriously petitioner took the

22  integrity of the process.  It also suggests a great deal about the reliability of his statements.  His

23  allegations of ineffective assistance of counsel accuse Mr. Vlautin of a serious breach of his duty

24  to a client.  Yet, petitioner disregards as immaterial his own statement to Mr. Vlautin because, as

25  petitioner tells it, he was only "not guilty" if he was being charged based on a statement that

26  petitioner thought would fail to prove his guilt.  But he was guilty if it turns out that there was a

witness who actually saw him commit the robbery.  Notwithstanding the apparent disregard of this statement for any objective truth as to whether petitioner did or did not commit the robbery, Mr. Vlautin had every right to rely upon petitioner's protestations that he would not plead guilty because he was, in fact, not guilty.  Indeed, it would have been a serious ethical breach for an attorney to plead a client guilty in light of that statement.

Petitioner insisted that he would have accepted the plea if only the severity of the situation had been explained.  He accuses Mr. Vlautin of ineffective assistance in not persuading petitioner of the urgency of taking advantage of the district attorney not being aware of the other strike.  The court finds that the petitioner's testimony is not credible.  Mr. Vlautin, on the other hand, credibly testified that

> . . . based on what I wrote, I made sure he knew about the severity of the situation that he was in, that there appeared to be another strike that would ultimately be discovered, which would raise his maximum up to life in prison.  And that I advised him very seriously that he ought to seriously consider pleading guilty.  But according to my notes he said he couldn't do that because he's not guilty and he may even be hiring a private lawyer.  And what that generally meant to me is that he had some dissatisfaction with the public defenders.  Many inmates have, many clients have, and they always think that they can get a better deal though a private lawyer.

EH RT 44.  He explained the significance and consequences of the uncharged prior burglary and the opportunity to resolve the case for only six years in the face of exposure of 35 years to life.  But Mr. Vlautin was confronted with a skeptical client who had just met him and appeared distrustful and was adamant about not pleading guilty.  Mr. Vlautin's testimony was particularly convincing in this regard, both in demeanor and content.  He described, with genuine sympathy for defendants, the difficulty of the situation like that petitioner faced here.  He noted that in the early days of three strikes "many times the probation department would unearth strikes that no one knew about, which would prevent a low term deal from ever happening."  EH RT at 43.  He also noted that with the situation here, it was:

////

14

1
2
3
4
5

> . . . a good offer, but it is difficult to convey the severity of this to a
> client, in that in my situation I didn't have any contact with this
> person prior to that day . . . and then I show up on the scene and
> speak to the client in the tank . . . .   So I come in and tell him what
> the offer is, and he's looking at me with distrust, and I do my best
> to let them know that the offer is six years and they better take it.
> But I can understand from the defendant's standpoint that it's a
> difficult deal to swallow right then. "

6   EH RT 46.  Mr. Vlautin's demeanor and manner of testimony inspired confidence in his

7   reliability and veracity as a witness.  In contrast, the reliability of petitioner's memory of events

8   at the time of the offer is dubious.  He conceded on cross-examination that he was taking "some

9   psych medication" shortly after his arrest which may have affected his memory of events.  EH

10   RT 24-25.  Moreover, the credibility of petitioner's testimony was undermined by implausible

11   allegations in light of his key admissions that he was told of the plea offer.  He wants the court to

12   find that Mr. Vlautin was simply not accurate when he testified that he explained the importance

13   of immediately taking the six-year deal.  However, Mr. Vlautin testified that from everything he

14   had seen from the notes and records he did advise the petitioner to immediately accept the six-

15   year offer.  "And [petitioner] said he would not plead.  In fact, he was not guilty. . . .  And if a

16   client ever tells me that, I tell them, well, then I'm not going to plead them guilty against their

17   will."  EH RT 46.  It was not Mr. Vlautin's duty to insist that the petitioner plead guilty against

18   his will and nothing in the Sixth Amendment requires such a result.

19        Finally, the court is impressed with the documentation showing a pattern of plaintiff

20   distrusting and second guessing the advice of his attorneys.  Beginning with the meeting of

21   attorney A. Merrilees on February 24, the notes show plaintiff attempting to take control of how

22   his attorneys would handle the case.  The notation shows that petitioner "wants a copy of

23   discovery" and "wants a list of all evidence seized from his house."  Pet., Ex. 7.  The notations

24   February 25 show that petitioner refused to take the six-year deal and told his public defender

25   that he may hire a private lawyer.  *Id.*  An entry of March 11 (referring to the second offer) again

26   says defendant "wont take offer."  *Id.*  It adds that petitioner "said wouldn't take this offer after

1   rejecting 6 yr. offer." *Id.* The notations for that day show that he again was talking about hiring

2   a private attorney. *Id.* This same pattern surfaced in the evidentiary hearing, where, once again,

3   petitioner was eager to second guess his own habeas counsel. EH RT 83, 91.

4          The petitioner had a brief opportunity to take advantage of a major mistake by the district

5   attorney.   At a pre-trial hearing on February 25, 1997, the prosecutor was unaware of one of

6   petitioner's previous convictions. Pet., Ex. 7. Based on that omission, the prosecutor offered a

7   plea bargain of a three-year prison term, doubled for a prior strike of which the prosecutor was

8   aware, for a total of six years. Pet., Ex. 7. Obviously, given petitioner's exposure with the

9   additional strike, he should have immediately accepted the offer. That is precisely what his

10  attorney told him he should do. But petitioner did not trust his defense attorney, thought he

11  could do better, and would not accept the deal. He told his public defender that he was going to

12  hire a private lawyer and that he would not accept a plea bargain because he was not guilty.

13         Under the first prong of *Strickland's* ineffective-assistance-of-counsel test, petitioner

14  must show that his counsel's advice during the plea bargaining process "fell below an objective

15  standard of reasonableness." *Strickland,* 466 U.S. at 688.  In evaluating petitioner's claims, there

16  is "a strong presumption that counsel's conduct falls within the wide range of reasonable

17  professional assistance." *Id.* at 689.  The record indicates that counsel was aware that an

18  additional strike prior had yet to be alleged, that he counseled petitioner about this offer, and that

19  petitioner rejected it, maintaining his innocence. Pet., Ex. 7.  Petitioner's uncorroborated after-

20  the-fact claim is legally insufficient to establish that he would have accepted the plea bargain.

21  Further, there is no evidence that had petitioner been able to contact counsel and arrange a court

22  appearance that the offer would have still been available. By that time, the prosecutor may have

23  realized the omission and withdrawn the plea bargain offer of six years. In fact, the prosecutor

24  did discover the additional strike and offered a second plea bargain at more than double the first

25  offer. Pet., Ex. 2.

26  ////

1    Counsel's conduct in communicating the six-year offer cannot be said to have been

2    outside the range of reasonable professional assistance.  Accordingly, petitioner is not entitled to

3    relief in regards to this aspect of his claim.

4                          ii.  **The Fifteen Years and Three Months Offer**

5    The second offer was made to petitioner via a different attorney.  That offer was for a

6    period of fifteen years and three months.  Pet., Ex. 2.  Petitioner maintains that he was never

7    informed of this offer and did not become aware of its existence until he was preparing an appeal

8    from his conviction.  Pet. at 3(26).  It is clear from the record, however, that petitioner was in

9    fact informed and properly advised regarding this offer, and that he twice rejected it on March

10   11, 1997, and April 24, 1997.  Pet., Ex. 7.  Attorney Sandra Martin of the Public Defender's

11   office testified to her communications with the petitioner regarding the second offer.  Testifying

12   from notes she entered on the day of the event, she testified that she clearly informed petitioner

13   of the offer and he refused it.  She read her notes of her March 11 meeting with petitioner as

14   follows:

15              Continue to March 25th for investigation.  D won't take offer.
                Warned regarding filing new complaint with exposure going up.
16              Says not guilty. Still talking about hiring attorney. Said wouldn't
                take this offer after rejected six-year offer.
17

18   EH RT at 69.  Although petitioner alleges that he told Ms. Martin that he wanted to accept the

19   six-year offer, she specifically testified that he did not.  EH RT at 70.  She added, "he told me he

20   was not guilty, and he said he wasn't going to accept the offer that was conveyed to me."  *Id.*

21   She testified that "in my notes it says that I warned him regarding the filing of the third strike.

22   So, obviously I would have let him know."  EH RT at 74.  "I would have let him know that he

23   would be looking at 25 years to life if he did not accept the offer.  And the district attorney, once

24   they filed the third strike, they never used to strike them back then."  *Id.*

25   Finally, Ms. Martin's notes of April 24 show that petitioner was still unwilling to accept

26   a plea offer, even after the motion to amend to add the third strike.  It states "still not interested

                                                17

in offer." Pet., Ex. 7.  The court finds Ms. Martin's testimony credible and consistent with the written notes she made at the time of the events in question.  On the other hand, petitioner's denials were self-serving and implausible in light of the other conceded facts.  The court does not credit petitioner's contrary testimony.

In light of the above credibility findings, counsel's performance cannot be said to be deficient for failing to communicate an offer when it is clear that the offer was, in fact, communicated to petitioner on two occasions.  Accordingly, petitioner is not entitled to relief on this claim.

### 4.  Alleged Incompetent Representation

Petitioner alleges that his trial counsel failed to conduct an adequate investigation.  Pet., at 6(1); 3(33-40).  Petitioner claims that a thorough investigation would have produced testimony from two witnesses that the victim, Joseph Schroeder, sold marijuana.  Pet., at 3(35-(36).  The record shows, however, that this evidence was introduced at trial by defense witness William Gardner.   RT 488-489.  There is no prejudice in not presenting cumulative evidence.  *Pizzuto v. Arave*, 280 F.3d 949, 958 (9th Cir. 2002).

Petitioner also claims that his counsel failed to call an alibi witness identified only as "Jessie," who would have testified that on the day of the robbery, petitioner was alone.  Pet., at 3(36).  Petitioner admitted on the stand, however, that at the time of the robbery he was present at the victim's house for the purpose of buying marijuana for his pregnant girlfriend.  RT 664, 675-676, 682-683.  There is no obligation to raise meritless arguments on a client's behalf.  *See Strickland*, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice).

Petitioner also claims that counsel failed to call another witness who would have claimed that the stolen property found by arresting officers at petitioner's apartment belonged to him.  Pet., at 3(36).  This evidence is irrelevant as petitioner was found guilty of receiving the stolen property, and thus the identity of the person who actually stole the property was not in issue.  CT

18

1   21-23, 216-221.

2         In making these arguments, petitioner has in no way proven that trial counsel's

3   performance was deficient.  Petitioner is not, therefore, entitled to relief on this claim.

4         **5.  Alleged Failure to Adequately Interview Witnesses**

5         Petitioner contends that trial counsel inadequately interviewed petitioner's co-defendant

6   William Gardner before calling him to testify.  Pet., at 6(1); 3(41).  Petitioner has not offered

7   proof that counsel's interviewing of the co-defendant was in any way deficient.  The inference

8   raised by petitioner's argument is that his co-defendant testified differently from the defense

9   theory of the case.[9]  This vague inference establishes no facts upon which this court may

10  conclude that counsel's preparation was lacking.  Therefore, petitioner is not entitled to relief on

11  this claim.

12        **6.  Alleged Ineffective Assistance in Advising Petitioner to Waive a Jury Trial on
         His  Prior Strike Convictions**

13

14        Petitioner next claims that he suffered from trial counsel's ineffective assistance in

15  advising him to waive a jury trial on his prior strike convictions.  Pet., at 3; 3(45-46).  The record

16  reflects that at one time petitioner expressed to the court his desire to have a jury decide the

17  veracity of the prior strike allegations, and then later waived that right.  RT 944-945, 947-950.

18  Before accepting petitioner's waiver in this regard, the following detailed admonishment and

19  discussion took place:

20              THE COURT:        Mr. Newton,[10] you have had time to talk to your attorney, but I still
                                 want to go through some information with you.  Some of this is the
21                               same information we discussed earlier.  It's important that you do
                                 understand your rights in this regard.
22

23  ─────────────────

24        [9]  The witness alternatively testified that there was no robbery and petitioner did not even
      enter the victim's house, then, after admitting to lying on the stand, testified that petitioner was
25  only present during the robbery because he was attempting to buy marijuana from the victim, but
      that petitioner was outside the whole time.  RT 487-575.

26        [10]  Petitioner's alias is James Newton.  CT 27.

You do have a right to a trial by jury on the issue of the truth of the prior convictions that are alleged in this information.

As I explained earlier, that right is a trial by jury with twelve people selected from the community that would serve as a jury, and the evidence would be presented to them. That jury would then decide based on the evidence whether or not they found that the prior convictions in your – any or all of them to be true.

In order to reach a decision, that jury would have to unanimously agree, all twelve, have to agree with regard to each conviction. This is your personal right.

You are entitled to the advice of an attorney, and it's important that you make your own personal decision regarding the right to trial by jury.

With regard to the priors, if you give up your right to trial by jury, I'm the one that will hear the evidence presented in this case. I am the one that will evaluate and decide the issue of the truth of the prior convictions.

Do you understand what I have just explained to you about your right to a trial by jury on the issue of the truth of the prior convictions?

THE DEFENDANT: Yes, ma'am.

THE COURT:   Do you understand what will happen if you waive?

THE DEFENDANT: Yes, ma'am.

THE COURT:   Do you have any questions about your right to a jury trial on this issue?

THE DEFENDANT: No.

THE COURT:   Do you need any further time to talk to your attorney about this?

THE DEFENDANT: No, ma'am.

THE COURT:   Have any promises been made to you to get you to give up your right to a trial by jury?

THE DEFENDANT: No, ma'am.

THE COURT:   Are you under the influence of any alcohol, medication or any other substance which would be clouding or affecting your judgment?

THE DEFENDANT: No ma'am.

20

| | | |
|---|---|---|
| 1 | THE COURT: | Clear headed, you know what you are doing? |
| 2 | THE DEFENDANT: | Yes, ma'am. |
| 3 | THE COURT: | For the record, you are in custody of the sheriff's department at this time. |
| 4 | | |
| 5 | | With respect to the prior convictions which are now charged in the information, do you now give up your right to a trial by jury and agree that those charges or these prior convictions can be tried before the Court, judged without a jury? |
| 6 | | |
| 7 | THE DEFENDANT: | Yes, ma'am. |
| 8 | THE COURT: | Do you join in that waiver, Ms. Teichert? |
| 9 | MS. TEICHERT: | I do. |
| 10 | THE COURT: | And I take it that, Miss Koller [sic], the People also join in the waiver of trial by jury? |
| 11 | | |
| 12 | MS. KOHLER: | Yes. |
| 13 | THE COURT: | I find that your waiver of trial by jury on the issue of the prior convictions to be knowing, intelligent and voluntary, and I do accept your waiver, and these prior convictions will be tried before the court if necessary following the verdict of the jury. |
| 14 | | |

RT 947-950.

Petitioner stated on the record that counsel adequately informed him about his right to a jury trial on his prior convictions, and answered in the negative when the court asked whether he needed further time to discuss this matter with counsel. RT 947-950. The record evidences that petitioner knowingly, intelligently, and voluntarily waived his right to a jury determination of the prior convictions charged in the information. RT 949-950. Petitioner does not provide objective and corroborated evidence, or any argument at all, that this waiver prejudiced him in any way. Petitioner cannot establish incompetence or prejudice under *Strickland*. *See Siripongs,* 133 F.3d at 737; *Pizzuto*, 280 F.3d at 955 (If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed) (quoting *Strickland*, 466 U.S. at 697). Accordingly, petitioner is not entitled to relief on this claim.

////

1    For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

2    application for a writ of habeas corpus be denied.

3    These findings and recommendations are submitted to the United States District Judge

4    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days after

5    being served with these findings and recommendations, any party may file written objections

6    with the court and serve a copy on all parties.  Such a document should be captioned "Objections

7    to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the

8    specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158

9    F.3d 449, 455 (9th Cir. 1998);  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

10   DATED:   February 22, 2007.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

22